[No. B141403. Second Dist., Div. Four. Apr. 24, 2001.]

SHAWN SIMONS et al., Plaintiffs and Appellants, v.
MARK STEVERSON et al., Defendants and Respondents.

694

**COUNSEL**

Robert W. Woods and Charles K. Wake for Plaintiffs and Appellants.

Haight, Brown & Bonesteel, John W. Sheller, Jules S. Zeman and Maureen Haight for Defendants and Respondents.

**OPINION**

**CURRY, J.**—Shawn Simons (Simons) and Allerton, LLC (Allerton; collectively, plaintiffs) appeal from the order granting the motions to quash service

of summons[1] made by Mark Steverson (Steverson), an individual, and by Rudolph & Beer, LLP (Rudolph & Beer), a New York limited liability partnership (collectively, defendants).

Based on our review of the record and applicable law, we reverse.

We hold that California may properly exercise personal jurisdiction over an out-of-state law firm which employed an attorney licensed to practice law in California who performed legal services governed by California law for California residents seeking recourse before California courts.

### Factual and Procedural Summary

The complaint filed on May 17, 1999, contained the following pertinent allegations: Simons was "an independent film producer who, at all material times, [was] a resident of Los Angeles County." Allerton was "a limited liability company organized and existing under and pursuant to the laws of the State of California." Steverson was a New York resident "who, at all material times, has been licensed to practice law, and has been practicing law, in the State of California." It was alleged on information and belief that Rudolph & Beer was "a limited liability partnership organized and existing under and pursuant to the laws of the State of New York" and that it was, "a law firm which authorized Steverson to act as its agent in practicing law in the State of California."

Prior to August 1997, during the development of a motion picture tentatively entitled Conspiracy of Weeds (Picture), Simons put together the "elements" of the picture, i.e., she obtained "commitments from certain 'star' actors, namely Roy Scheider, Judge Reinhold, Moira Kelly, Sean Patrick Flanery, and Jeremy Sisto" to appear in that picture and from Annette Haywood-Carter to be the director.

Around August 1997, based on those "elements," Silverline Pictures, Inc. (Silverline) made a commitment to act as foreign sales agent and represented to Simons that it could make substantial presales of the Picture at the "MIFED" film market, which was to commence on or about October 19, 1997, in Milan, Italy.

Also around August 1997, Imperial Bank (Imperial) "indicated a willingness to provide a loan to plaintiffs to finance the production of the Picture."

---

[1] The reporter's transcript of the proceedings reflects the court intended also to enter an order dismissing the case. We note, however, no dismissal order is included in the plaintiffs' appendix filed in lieu of the clerk's transcript. In any event, the appeal is properly taken from the order granting the motions to quash. (Code Civ. Proc., § 904.1, subd. (a)(3).)

A condition precedent to that loan was the delivery to Imperial of "executed foreign distribution pre-sales contracts in an aggregate sum sufficient to serve as the necessary collateral." Imperial also "indicated a willingness to provide 'gap' financing, such that the amount of the loan would exceed the aggregate sum of the pre-sale contracts, with [Imperial, in return,] taking an additional fee and a percentage of the [Picture's] net profits."

"In or about August, 1997, Simons retained Steverson to perform certain legal services for plaintiffs with respect to the Picture." Those services "were to be performed in California and included, but were not limited to, the formation of plaintiff Allerton and the negotiating and drafting of all agreements relating to financing and production of the Picture, including but not limited to actors' agreements, location agreements, and crew agreements. Steverson was also to negotiate and draft an agreement between Allerton and Silverline, and Steverson was to handle all legal work related to [Imperial's] loan for production of the Picture. Steverson represented to Simons that he was an experienced entertainment attorney and that he was fully competent to perform the services required by plaintiffs. Steverson accepted such employment and agreed to perform the services for plaintiffs."

"Defendants continually represented to Simons and Silverline that the contract between Allerton and Silverline would be executed prior to the MIFED sales market commencing on or about October 19, 1997." Steverson knew and understood that time was of the essence in negotiating the Allerton-Silverline agreement, because such agreement was necessary before Silverline would obtain any foreign distribution presale contracts; that delivery of such contracts to Imperial was a condition precedent to any loan; and that funding of the loan prior to early January 1998, when principal photography was scheduled to begin, was necessary for completion of the prepre-production work leading up to such photography.

The complaint pleaded four causes of action. The first was for breach of an oral contract for legal services based on defendants' failure and refusal "to competently perform the necessary legal services for plaintiffs, or to perform any legal services whatsoever." For instance, they "failed to timely negotiate or draft an agreement between Allerton and Silverline, failed to timely negotiate or draft any agreements between Allerton and the actors or crew . . . , and failed to timely negotiate any agreements between Allerton and [Imperial] with respect to [Imperial's] proposed financing of the Picture."

The second cause of action for fraud alleged that Steverson made the following representations, which were false: (1) Around October 1997,

Steverson represented to Simons that he had negotiated and drafted an agreement between Allerton and Silverline and that Silverline had executed it; (2) around that same time, after Silverline returned from the MIFED film market, "Steverson represented to Simons that Silverline had entered into executed written foreign distribution pre-sale contracts for the Picture in a sum exceeding $1,100,000"; that Imperial "would make the necessary loan, due to the pre-sales contracts obtained by Silverline, and therefore Simons could safely commence pre-production of the Picture"; and (3) "Continuously from August, 1997, through and including mid-December, 1997, Steverson represented to Simons on numerous occasions that he was fully and completely performing the necessary legal services for financing and production of the Picture, that everything was going smoothly, that plaintiffs had nothing to worry about, and that plaintiffs could safely proceed with pre-production, so as to commence principal photography of the Picture in early January, 1998."

Rather, the true facts were: (1) Steverson failed to negotiate or draft the Allerton-Silverline agreement until early December 1997, more than a month after the MIFED film market; (2) in the absence of a timely Allerton-Silverline agreement, Silverline did not obtain executed written foreign distribution presale contracts in any sum, much less a sum exceeding $1.1 million; (3) because there were no presale contracts delivered to Imperial, Imperial did not commit to make the requisite loan; and (4) Steverson did not negotiate or prepare any agreements with actors or crew.

The third cause of action for constructive fraud alleged defendants, as plaintiffs' attorneys, owed a fiduciary duty to plaintiffs, which defendants breached by failing to disclose the above material, true facts.

The fourth cause of action for professional negligence was based on defendants' alleged negligent performance of and failure to perform the legal services as pleaded in the first and second causes of action.

On November 10, 1999, and January 5, 2000, respectively, Rudolph & Beer and Steverson filed their motions to quash service of summons on the ground that the court lacked both general and limited personal jurisdiction. They argued that plaintiffs failed to satisfy, by the preponderance of the evidence, the elements of what they denominated as the "*Sher/Cubbage* test" for determining whether a nonresident attorney defendant has sufficient contacts with the forum state to subject that attorney to the court's jurisdiction.

Citing to *Sher v. Johnson* (9th Cir. 1990) 911 F.2d 1357, 1361, and to *Cubbage v. Merchent* (9th Cir. 1984) 744 F.2d 665, 668, defendants argued

that plaintiffs were required to show, by the preponderance of the evidence, that: (1) "The non-resident attorney must have taken some action whereby he purposefully avails himself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of the forum's laws"; (2) the "[p]laintiff's claim must arise out of or result from the non-resident attorney's forum related activities"; and (3) "[E]xercising of the forum state's jurisdiction over the non-residential attorney must be reasonable."

As evidentiary support, they relied on the declarations of Steverson and Steven C. Beer (Beer) to show that plaintiffs could not establish each of the above elements of the designated "*Sher/Cubbage* test."

In his declaration, Beer made the following statements: (1) Beer was a named partner in Rudolph & Beer who was admitted to practice law in New York, Illinois, and Connecticut, and he resided in the state of New York; (2) Beer was the principal supervisor of Steverson, an attorney at Rudolph & Beer who did not practice law in the state of New York, but rather, was someone who "functions essentially as a law clerk and all of his work is supervised by attorneys"; (3) Beer did "not believe that . . . Steverson traveled to California to either solicit legal business or to conduct legal business pertaining to the matters alleged in plaintiffs' complaint during the period of time referenced in plaintiffs' complaint"; and (4) Beer did "not believe that any partner, attorney or employee of Rudolph & Beer ever traveled to California to either solicit or conduct legal business pertaining to the matters alleged in plaintiffs' complaint during the period of time referenced in plaintiffs' complaint."

In his declaration, Steverson stated: (1) Steverson was a resident of the state of New York and was licensed to practice before all the courts in California; (2) "During the period of time referenced in plaintiff's [*sic*] complaint, [Steverson] never traveled to California to solicit or conduct legal business pertaining to any other matter"; and (3) "At some time within the period of time referenced in plaintiffs' complaint, [Steverson] became aware of the fact that principal photography of the [Picture] was to take place in Texas."

On March 6, 2000, plaintiffs filed their opposition. They argued that defendants' representation of plaintiffs constituted the practice of law in California (*Birbrower, Montalbano, Condon & Frank v. Superior Court* (1998) 17 Cal.4th 119 [70 Cal.Rptr.2d 304, 949 P.2d 1]) and that "defendants have similarly practiced law in California on behalf of five other California residents during the relevant period."

As evidentiary support, they relied primarily on the declarations of Charles K. Wake (Wake) and Robert W. Woods (Woods), plaintiffs' attorneys, and the declaration of Simons.

In his declaration, Wake stated it was an undisputed fact that Steverson was only admitted to practice law in California. Plaintiffs pointed out that this fact was omitted from Beer's declaration and characterized as "affirmatively misrepresent[ing] the nature of Steverson's role," the statement in Beer's declaration that "Steverson functions essentially as a law clerk and all of his work is supervised by attorneys."

Attached to Wake's declaration was a copy of the 1999 Martindale-Hubbell law firm listing for Rudolph & Beer, wherein Steverson was listed as an "associate" whose practice consisted of entertainment law. Attached as exhibit A to the opposition memorandum was a copy of the letter dated October 29, 1998, from Laurence H. Rudolph (Rudolph), a named partner of Rudolph & Beer. The letterhead listed Steverson as "admitted in California only."

In that letter, Rudolph rejected the request by Los Angeles Attorney Patrick McGannon, made on behalf of Simons, for a refund of her $10,000 retainer and stated his position that Simons "owes us additional fees at this time" of $5,000, because "the work performed by us at [Simons's] insistence was substantial." Although Simons had agreed to pay a $25,000 "flat fee," Rudolph agreed to waive the amount above such $15,000 in view of the fact the film was never finished. To support his claim for additional fees, Rudolph appended to his letter a copy of a memorandum from "Steverson, Esq.," who Rudolph represented was "one of the three (3) lawyers in this office who worked on . . . Simons' project." In his memorandum dated October 28, 1998, Steverson stated that the "memorandum details [his] services on the [Picture] in either a direct or supervisory capacity."[2]

In her declaration, Simons stated that "[a]t all times," she understood Steverson was representing her and Allerton as an attorney and that he

---

[2]Steverson explained that he became involved in the Picture when a long-term director client, Annette Haywood-Carter, requested he help out Simons as the Picture's producer. He agreed to help out Simons "on an interim basis merely as a favor to" Haywood-Carter. "With respect to payment, if any, for legal services rendered by [him] during this interim period," he and Simons agreed to discuss such payment "at some point in the future."

With respect to the time frame of October and November 1997, Steverson stated he "reviewed, negotiated and completed a sales/agent/distribution agreement with Silverline" regarding the Picture and listed 25 hours as the time spent for such services. Also, despite nonpayment of even the minimum Rudolph & Beer fee of $3,000, Steverson "authorized" Emerson Bruns, who was listed on the Rudolph & Beer letterhead, "to process and complete the" formation of Allerton as a legal entity. Bruns in fact "formed a Limited Liability Company entitled Allerton, LLC with respect to the [Picture, and s]hortly thereafter Emerson

"never informed [her] that he was merely a 'law clerk' as defendants asserted in their motions to quash." She further stated that "the services performed, or to be performed, by Steverson" included: (1) The "[f]ormation of Allerton, a California limited liability company and California resident, as the production entity;" (2) the "[n]egotiation of a distribution agreement governed by California law between Allerton and Silverline[], another California resident; and" (3) the "[n]egotiation of a financing agreement to be governed by California law between Allerton and Imperial[], yet another California resident."

In his declaration, Wake stated that he obtained the declarations of three other California residents for whom Steverson performed legal services and who were never informed that Steverson was merely a "law clerk." Copies of the declarations of these three clients, Ken Carter, Annette Haywood-Carter, and Daniel Cosgrove, were attached to the opposition memorandum, respectively, as exhibits G, H, and I.

In his declaration, Woods stated that "[o]n February 28, 2000, pursuant to a stipulation of counsel entered into in open court on February 24, 2000," Rudolph & Beer and Steverson produced a summary of their California resident clients and the general subject matter of the legal work performed during October 1997 through September 1999. Exhibits K and L to the opposition are copies of those summaries.

---

completed all additional required documentation with respect to the formation of Allerton, LLC."

Additionally, Steverson performed the following services during that time period. He spent two hours holding "several discussions with the [Picture's] casting director and . . . agent regarding the casting director's deal." He expended six hours in securing Moira Kelly's continued participation in the Picture through many telephone calls and "extensive negotiations[.]" He also expended 15 hours in "conduct[ing] numerous telephone calls with Jon Shiffman of Imperial Bank regarding the possible financing of the Project by Imperial Bank. This financing commitment would have been accomplished by a combination of equity participation and bank loan(s). Said Bank loans would have been in the form of bridge loans, gap financing and/or loans against foreign distribution agreements[.]"

Moreover, in November 1997, Steverson expended five hours in reviewing Imperial's initial financial package offer and three hours reviewing the director of photography, location, and production designer agreements.

Sometime in December 1997, he expended three hours reviewing all applicable union and guild documents regarding the Picture and an "E&O insurance policy application."

On December 16, 1997, he expended one hour with respect to the "first draft actor agreement sent to Steve Dontanville . . . for the services of Judge Reinhold."

On December 19, 1997, Steverson expended two hours with respect to the first draft actor agreements sent to Jack Gilardi for the services of Roy Scheider and to Doug Robinson for the services of Jeremy Sisto.

In January 1998, Steverson spent one hour reviewing "all chain of title documentation with respect to the [Picture]."

Exhibit K reflects that Rudolph & Beers admitted to having represented five clients who were California residents during the specified time frame. Around September 1999, it represented an individual referred to as "Client X" regarding "Film Production—Exec. Producer Role" for the total fee of $1,000. Around January 1999, Rudolph & Beers represented an individual referred to as "Client Y" regarding "Producer Representation—Sales Rep." for the total fee of $2,500. From July 1998 through March 1999, it represented an individual referred to as "Client Z" regarding "Talent Representation" for the total fee of $6,238. Rudolph & Beers referred to Simons and Allerton together as the fourth client. The fifth client was Haywood-Carter during the period of the Picture project regarding "Director Representation."

Exhibit L reflects that Steverson admitted that while acting as an agent on behalf of Rudolph & Beer, he represented the Client Z referred to above regarding Talent Representation from July 1998, through March 1999 for the total fee of $6,238. He also admitted to representing plaintiffs and Haywood-Carter during the period of the Picture project.

Woods further stated in his declaration that pursuant to stipulation of counsel, on March 3, 2000, defendants produced certain documents reflecting legal work they performed for their California resident clients. Exhibit M to the opposition was a copy of a letter on Rudolph & Beer letterhead dated March 31, 1998, from Beer to Client X in which Beer thanked the client for his "fax regarding [his] proposed involvement in [a] film" and stated he was "looking forward to discussing the specific terms [the client] proposed . . . during [Beer's] visit to Los Angeles [the] next week." Beer added that he also "look[ed] forward to speaking with [Client X] promptly thereafter."

Woods also stated that based on other documents produced, which were attached to the opposition as exhibits N through P, it was "clear that Beer [also] traveled to [the American Film Market in Santa Monica,] California on behalf of Client Y, a California resident, to negotiate distribution agreements for Client Y's film."

Similarly, Woods stated that exhibits Q through S, which are copies of additional documents produced by defendants, revealed defendants represented California resident client Cosgrove, i.e., Client Z, and that Steverson also represented Carter, i.e., Client ZZ, on matters involving California law.

Exhibit Q is a copy of Client Z's letter dated July 28, 1998, in which Client Z informed the recipient that Steverson "was authorized by [Client Z] to deal with all [his] contractual matters as it relates to [his] entertainment life" and that if the recipient had "any questions concerning this letter or any

other matter, please direct them solely to [his] attorney . . . Steverson[.]" Exhibit R is a copy of a February 26, 1999, letter on Rudolph & Beer letterhead from Beer to Client Z to which Beer attached "a 'redlined' draft of the [captioned] Agency Rider," which Woods stated pertained to "a California talent agent who was seeking to represent Cosgrove [i.e., Client Z]." Exhibit S is a copy of a fax cover sheet dated August 10, 1994, a copy of a cover letter dated June 14, 1994, from Steverson to Client ZZ,[3] and a copy of a draft option/purchase agreement on behalf of Carter, Steverson's Client ZZ to be governed by California law and upon which Steverson made numerous handwritten comments.

Woods also stated in his declaration that certain discovery responses by Rudolph & Beer disclaiming travel to California for the purpose of performing legal services were false. The responses were verified by Beer. In response to special interrogatory No. (SI No.) 7 of the first set of interrogatories, Rudolph & Beer stated that "[d]uring the relevant time period[, i.e., from October 1, 1997, and continuing to the present date], [it] is not aware that any person employed by [Rudolph & Beer] ever traveled to the State of California to render legal services." Similarly, in response to SI No. 12, Rudolph & Beer stated that "[d]uring the relevant time period, [it] has no knowledge that any person employed by [Rudolph & Beer] ever traveled to the State of California for the purpose of marketing, offering, promoting, or obtaining financing for, any motion picture or television series on behalf of any client."

Woods stated the falsity of these responses was established by other discovery produced by Rudolph & Beer. In response to SI Nos. 14 and 15, Rudolph & Beer admitted that Beer, on behalf of Rudolph & Beer, traveled to Santa Monica, California for three days in March 1999, to attend the American Film Market. Exhibit M reflects that in March 1998, Beer traveled to Los Angeles to discuss "specific terms" regarding a project proposed by Client X. Similarly, exhibits O and P reflect in March 1999, Beer traveled to California to attend the American Film Market and to promote the film of Client Y, for whom Rudolph & Beer acted as "distribution counsel and producer's representative" according to Woods.

On March 10, 2000, Rudolph & Beer and Steverson filed a joint reply to the opposition. Defendants reasserted their original position that the plaintiffs in this case had failed to meet the jurisdictional test set forth in *Sher* and

---

[3]The cover letter was on the letterhead of the New York law firm of "Grubman[,] Indursky[,] Schindler & Goldstein P.C." The complaint alleged this law firm "authorized Steverson to act as its agent in practicing law in the State of California." It further alleged that "[i]n August, 1997, Steverson was a New York resident, employed by [that] law firm" and "in or about October, 1997, Steverson left the employment of Grubman, Indursky and became employed by defendant Rudolph & Beer."

*Cubbage*, which they urged were the controlling cases. They argued *Birbrower* was factually inapposite, because the defendant New York law firm in that case answered the complaint instead of challenging the jurisdiction of the California court. They also argued the opposition evidence failed to show defendants purposefully availed themselves of the benefits afforded by California.

After conceding Rudolph & Beers had five "California resident clients over the last few years[,]" defendants argued the fees paid these clients was "insignificant to the business of the firm," because "**[c]ombined, this is less than $20,000 over a period of time spanning at least three years[, b]ut in that same three years the law firm has made millions of dollars a year in revenue.**" No evidence was proffered to support this argument. (Boldface lettering in original.)

Defendants further argued that plaintiffs failed to show either Rudolph & Beer or Steverson solicited clients or obtained other business in California. Rather, "[p]laintiffs have only been able to show that . . . Beer, a named shareholder in Rudolph & Beer, has attended a film conference that takes place in Santa Monica every year. But it is an international conference; it has not always been in Santa Monica in the past and it might not be held in Santa Monica in the future. . . . Beer, however, will still attend."

During the March 16, 2000, hearing on the motions, the trial court indicated its tentative ruling was to grant the motions. The court essentially found persuasive four factors. The first was the failure of plaintiffs "to attach a copy of the signed contract with Steverson to the complaint to establish that Steverson entered into the contract as a California attorney." The second was the proffer by plaintiffs of "very little documentary stuff about Steverson which could be decisive." The third was that although plaintiffs allege "the agreement was based on an oral contract to perform services in the state of California[,]" they "never paid for said legal services, [and] failed to state what correspondence . . . phone calls, writings, [and] so forth" which took place between the parties.[4]

The fourth factor was plaintiffs' failure to submit sufficient facts to establish "[t]hat defendant [Steverson] purposefully availed himself of the benefits of the protection of the state of California, [i.e.,] conducting business as legal business activities from the state of California."

With respect to the last factor, the court stated, "It's a close case in a sense, but I can't make it a draw. It's close[, b]ut it appears that he didn't

---

[4]The record, however, reflects Simons in fact paid Rudolph & Beer $10,000.

have an office here"; Steverson "may be licensed to practice [law] here but [he] never practice[d] here"; and "[e]ven though he found some other people, that wasn't satisfactory to show either just because they're residents of California."

During the ensuing argument, Wake, plaintiffs' attorney, pointed out that because it was undisputed that Steverson was only licensed to practice law in California, clearly, he could not have "enter[ed] into a contract to represent the plaintiffs as a New York attorney because he's not licensed to practice law in New York."

Wake then stated that Steverson was representing "California residents in connection with California legal matters: negotiating contracts with other California residents." The court responded, "The firm [i.e., Rudolph & Beer,] represented them. He didn't represent them."

Referring to exhibit A to the opposition papers, Wake pointed out Steverson specifically acknowledged he " 'reviewed, negotiated and completed a sales agent/distribution agreement with Silverline," which, Wake added, was the same agreement referred to in Simons' declaration and which "by its terms is governed by California law. There's no dispute about that fact[.]'" In response to the court's inquiry, he explained Steverson acted "as an associate of the firm," not on his own behalf.

The court disagreed that the act of negotiating qualified as the practice of law and pointed out Steverson "didn't say he represented anyone as a lawyer." Wake argued that what Steverson did constitute the practice of law in California and cited *Birbrower* as authority.

He further argued that the facts in the opposition declarations established that Steverson "personally, as an associate of that firm, represented California clients, negotiated contracts on their behalf with other California residents which were governed by California law." He added that Steverson did not come back and say "I did not do that. I never represented [Simons or Allerton] in doing that. Those contracts weren't governed by California law. Those people weren't California residents I was negotiating with." David Nelson (Nelson), defendants' attorney, did not contradict Wake when the latter noted that what he had just stated were "undisputed facts."

Wake also argued that as "a transactional attorney," Steverson "could have done what he did from anywhere[, e.g.,] from Century City, from New York, from Miami, . . . because of the fact that it doesn't require appearances in court." After pointing out that Birbrower, an individual, was

practicing law in California, "[a]lthough not physically present here, by advising a California client on California law in connection with a California legal dispute by telephone, fax, computer or other modern technological means," Wake urged that this was "exactly what happened [here. Steverson] represented a California client negotiating a California contract."

After Nelson disagreed that *Birbrower* controlled, the court stated, "Just the princip[le] that you don't have to be physically here to practice law in California, unless you apply it to the facts of this case, that's just a princip[le]." Wake pointed out that defendants had not "cited a case that says you can practice law in the state of California and be immune from jurisdiction here" and urged that "the *Sher* case disagrees with *Brown v. Watson* [(1989) 207 Cal.App.3d 1306 [255 Cal.Rptr. 507]], but *Brown v. Watson* is controlling California law."

The court responded "[t]hese cases cited to me are cases where you have got something specific. You've got so much confusion in this case, it isn't clear what you're talking about here." The court then stated that assuming there is an attorney "working for a New York firm and they don't have an office out here[, and t]hey don't have any contact with California, [then t]hey don't even have minimum contact with California."

Nelson argued there were additional factors which the court should consider, i.e., the film was to be made in Texas and the source of the money to finance the film, according to one of the contracts, was located "[a]ll over the world, including Italy." He added that because the film would be made in Texas, and thus, the actors and crew would be in Texas, "if anything, it's a Texas case as much as it is a California case." The court agreed that "[i]t's more so than it would be a California case."

Wake responded that there is no significance to the fact the film would be shot in Texas or "[w]here the rights were being sold," because plaintiffs' claims did not arise from the filming of the Picture. Rather, the significant facts were that both the distributor and the financier, Imperial, were in California; Steverson negotiated the contracts with them; and the contracts are governed by California law.

After the court stated it was "certainly going to grant the motion[s] to quash," Wake argued that because the court considered the matter to be close, it should balance the convenience of the parties and that, in so doing, the court should deny the motions. He stated, except for the New York defendants, everyone else who would be called as witnesses was in California. Nelson did not dispute this statement.

After disagreeing this was a sufficient showing, the court noted "[t]his is a jurisdictional question" and found there was not "enough contact to have jurisdiction." Wake argued that defendants "purposefully availed themselves of the benefits and protections of California" through their actions, which he urged constituted the practice of law in California and which constituted "something that can only be done lawfully in California."

Nelson distinguished *Birbrower* on the ground that in seeking to recover money from California clients, the New York firm in that case attempted to invoke the California court system. The court responded, "Like you said, this case touches Texas and other countries, foreign countries. At worst, I guess you could say they shared jurisdiction, at the very worst. There's no reason why it shouldn't be in New York [rather than] it should be here."

In granting the motions, the court found that plaintiffs were not "misled at all" in that they knew "[t]hey were dealing with a New York firm[, and t]hey wanted to deal with a New York firm. They may not have wanted to deal with a California firm, but they could have." The court added that "[t]hat's the bothersome part of this case."

The minute order granting the motions recites: "The Court has read and considered [the] moving papers on the Motion to Quash and incorporates them herein by reference. The Court grants the motion to quash on the basis that the court lacks jurisdiction over the defendant. Based on the documents on file plaintiff has failed to show that the Court has either general or limited jurisdiction over the defendant. Defendant has no substantial activities in this state. Further, the defendant has not sufficient contacts in relation to this case with this forum to give the court limited jurisdiction over the defendant. Plaintiff has failed to meet the *Sher/Cubbage Test* as mentioned in defendant's briefs."

## DISCUSSION

■ Plaintiffs contend the trial court erroneously applied a "*Sher/Cubbage* test" in granting the motions to quash and the motions, instead, should have been denied on the alternative grounds that the practice of law in California by defendants was sufficient to justify the exercise of personal jurisdiction over them, and such jurisdiction was warranted based on the balance of conveniences and state interest. We find merit in plaintiffs' position and reverse.

■ "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

(Code Civ. Proc., § 410.10.) "A state court's assertion of personal jurisdiction over a nonresident defendant who has not been served with process within the state comports with the requirements of the due process clause of the federal Constitution if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate ' "traditional notions of fair play and substantial justice." ' (*International Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057] . . . .)" (*Vons Companies, Inc.* v. *Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444-445 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons Companies, Inc.*), citations omitted.)

Conversely, "each individual has a liberty interest in not being subject to the judgments of a forum with which he or she has established no meaningful minimum 'contacts, ties or relations.' (*Burger King Corp.* v. *Rudzewicz* (1985) 471 U.S. 462, 471-472 [85 L.Ed.2d 528, 540, 105 S.Ct. 2174] (*Burger King*) . . . .) As a matter of fairness, a defendant should not be 'haled into a jurisdiction solely as the result of "random," "fortuitous," or "attenuated" contacts.' (*Burger King, supra,* 471 U.S. at p. 475 [85 L.Ed.2d at p. 542].)" (*Vons Companies, Inc., supra,* 14 Cal.4th at p. 445.)

▆ "Personal jurisdiction may be either general or specific." (*Vons Companies, Inc., supra,* 14 Cal.4th at p. 445.) General jurisdiction exists if there are substantial, systematic, and continuous contacts between the nonresident defendant and the state. In the absence of such general jurisdiction, personal jurisdiction over the nonresident defendant nonetheless is proper on the theory of specific jurisdiction where the nonresident defendant purposely availed himself of the benefits or privileges of the forum; deliberately engaged in significant forum activities; or created continuing obligations between himself and forum residents. (*Id.* at pp. 445-446.) Nonetheless, "the high court has made it clear that a state's jurisdiction to provide a forum is *not limited* to claims that involve conduct that took place within the state's borders. . . ." (*Id.* at p. 473, italics in original, citation omitted.)

▆ "[I]n analyzing the exercise of specific jurisdiction, '[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." ' (*Burger King, supra,* 471 U.S. at p. 476 [85 L.Ed.2d at p. 543], quoting *International Shoe* [*Co.* v. *Washington, supra,*] 326 U.S. at p. 320 [90 L.Ed. at p. 104].) Courts may evaluate the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared

interest of the several States in furthering fundamental substantial social policies."' (*Burger King, supra,* 471 U.S. at p. 477 [85 L.Ed.2d at p. 543].)" (*Vons Companies, Inc., supra,* 14 Cal.4th at pp. 447-448.)

"The United States Supreme Court has stated more than once that the nexus required to establish specific jurisdiction is between the defendant, *the forum,* and the litigation . . . —not between the plaintiff and the defendant." (*Vons Companies, Inc, supra,* 14 Cal.4th at p. 458, italics in original, citations omitted.) "[T]he defendant's forum activities [thus] need not be directed at the *plaintiff* in order to give rise to specific jurisdiction." (*Id.* at p. 457, italics in original.) Similarly, "[a] claim need not arise directly from the defendant's forum contacts in order to be sufficiently related to the contact to warrant the exercise of specific jurisdiction. Rather, as long as the claim bears a substantial connection to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate. The due process clause is concerned with protecting nonresident defendants from being brought unfairly into court in the forum, on the basis of random contacts. That constitutional provision, however, does not provide defendants with a shield against jurisdiction when the defendant purposefully has availed himself or herself of benefits in the forum. The goal of fairness is well served by the standard [our Supreme Court] originally set out in *Cornelison* [*v. Chaney* (1976)] 16 Cal.3d 143 [127 Cal.Rptr. 352, 545 P.2d 264], that is, there must be a *substantial connection* between the forum contacts and the plaintiff's claim to warrant the exercise of specific jurisdiction. (*Id.* at p. 148.)" (*Id.* at p. 452, italics in original.)

"[T]he appropriate inquiry [therefore] is whether the plaintiff's cause of action 'arises out of or has a substantial connection with a business relationship defendant has purposefully established with California.'" (*Vons Companies, Inc., supra,* 14 Cal.4th at p. 448, quoting from *Cornelison v. Chaney, supra,* 16 Cal.3d at p. 149.) "In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. . . . The crucial inquiry [thus] concerns the character of defendant's activity in the forum, whether the cause of action *arises out of or has a substantial connection* with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction.' . . ." (14 Cal.4th at p. 448, italics in original, citation omitted.) Clearly, "a person who purposefully takes advantage of the benefits of doing business in the forum state fairly can be required to answer lawsuits that relate to his or her activities there . . . ." (*Id.* at p. 474, citation omitted.)

■ Plaintiffs have the burden of establishing by a preponderance of the evidence that jurisdiction is proper. If that burden is satisfied, the burden shifts to the defendant to " 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' . . ." (*Vons Companies, Inc., supra*, 14 Cal.4th at p. 476, citation omitted.) Where the jurisdictional facts are not in conflict, the appellate court is presented with a question of law and conducts review of the jurisdictional issue de novo. (See, e.g., *id.* at pp. 449, 475-476; *Tri-West Ins. Services, Inc. v. Seguros Monterrey Aetna, S.A.* (2000) 78 Cal.App.4th 672, 677 [93 Cal.Rptr.2d 78]; *Hall v. LaRonde* (1997) 56 Cal.App.4th 1342, 1346 [66 Cal.Rptr.2d 399].)

■ Mindful of the foregoing, we initially find the trial court erred in relying on the so-called "*Sher/Cubbage* test", a term coined by defendants. We conclude that the proposed rigid "*Sher/Cubbage* test" does not comport with either the dictates of the United States or our Supreme Courts. We therefore decline defendants' invitation to adopt it.

■ In *Cornelison*, our Supreme Court rejected "a rigid test in favor of a flexible approach grounded in the quality and nature of the activity of the defendant in the [forum], fairness to the parties, and the orderly administration of the law" and expressly held "[t]he question of jurisdiction cannot be decided by the application of some precise formula." (*Cornelison v. Chaney, supra*, 16 Cal.3d at p. 150.)

Similarly, in *Von Companies, Inc., supra*, 14 Cal.4th 434, its most recent pronouncement on the subject, our Supreme Court admonished that "[w]e must recall that the United States Supreme Court has rejected the use of 'talismanic jurisdictional formulas' (*Burger King, supra*, 471 U.S. at p. 485 [85 L.Ed.2d at p. 549]), stating that ' "the facts of each case must [always] be weighed" in determining whether personal jurisdiction would comport with "fair play and substantial justice." ' (*Id.* at pp. 485-486 [85 L.Ed.2d at p. 549].)" (*Id.* at p. 460.)

■ On the merits, we conclude the undisputed jurisdictional facts establish ample contacts, not merely "minimum contacts," to warrant specific jurisdiction over defendants arising from their practice of law in California. (See *Brown v. Watson, supra*, 207 Cal.App.3d 1306, 1314-1315 [specific jurisdiction warranted over Texas attorneys where those attorneys were retained in California through plaintiffs' California attorneys; they were to be paid by the California attorneys through a fee-splitting arrangement; they corresponded and telephoned those attorneys and plaintiffs over a period of four years; and where the complaint alleged they were negligent in

failing timely to effect service of process under Texas law, which resulted in dismissal of the Texas action and caused damage to California plaintiffs]; cf. *Crea v. Busby* (1996) 48 Cal.App.4th 509, 515-516 [55 Cal.Rptr.2d 513] [no personal jurisdiction over Oregon resident although he was licensed to practice law in California as well as Oregon where he had "not practiced law in California in 14 years"; he did "not maintain an office, solicit clients, advertise, own property, or have obligations in California"; and he was contacted by Oregon residents "in Oregon to file suit in Oregon on behalf of an Oregon corporation regarding a licensing agreement breached in Oregon"]; *Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221, 234, 236 [29 Cal.Rptr.2d 281] [no personal jurisdiction over Hawaii attorney who accepted payment from a California client who made telephone calls and wrote letters to and from California as well as traveled to California to represent client in deposition in a Hawaii action].)·

We find the trial court erred in finding that with respect to his dealing with plaintiffs, Steverson was simply a law clerk, not an attorney. In his declaration Beer stated that Steverson merely acted as a "law clerk." Each of these legal conclusions is unsupported by the record. Additionally, Beer's disingenuous statement embodies a misrepresentation of the facts.

The uncontroverted facts in the record, instead, establish that during the relevant period, Steverson, an attorney licensed to practice law in California but not New York, was an associate of defendant Rudolph & Beer, a New York law firm, and, on behalf of Rudolph & Beer, agreed to provide and provided legal services under California law to California resident plaintiffs. It is established that the practice of law in California includes the giving of "legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation." (*Birbrower, Montalbano, Condon & Frank v. Superior Court, supra,* 17 Cal.4th 119, 128.)

Initially, we point out the record is barren of any competent evidence that Steverson did not travel to California to perform legal services for California residents.

In his declaration, Beer stated he did "not believe that . . . Steverson traveled to California to either solicit legal business or to conduct legal business pertaining to the maters alleged in plaintiffs' complaint during the period of time referenced in plaintiffs' complaint" and Beer also did "not believe that any partner, attorney or employee of Rudolph & Beer ever traveled to California to either solicit or conduct legal business pertaining to the matters in plaintiffs' complaint during [that same time frame]." These general statements of belief are legally inconsequential. Such statements do

not operate to prove the facts that the speaker merely believes to be true. (See, e.g., *People v. Chambers* (1982) 136 Cal.App.3d 444, 452, fn. 2 [186 Cal.Rptr. 306].)

In his declaration, Steverson simply denied that he ever "traveled to California to solicit or conduct legal business pertaining *to any other matter*" during the relevant time frame. This statement amounts to sophistry and misdirection. He never stated that he did not travel, make any telephone calls, send any faxes, etc., to California regarding *this* matter.

In any event, Steverson's physical presence in California, or his absence, is not determinative. The "practice [of] law in the state [occurs] although [the attorney is] not physically present here by [his] advising a California client on California law in connection with a California legal dispute by telephone, fax, computer, or other modern technological means." (*Birbrower, Montalbano, Condon & Frank v. Superior Court, supra,* 17 Cal.4th at pp. 128-129.) Accordingly, the crucial inquiry simply is whether Steverson, as a California licensed lawyer, performed legal services for California residents.

By his own admission, Steverson "reviewed, negotiated and completed a sales agent/distribution agreement with Silverline," a California resident, with respect to the Picture, and he authorized another Rudolph & Beer attorney "to process and complete" the formation of plaintiff Allerton as a legal entity, which actions were in fact taken.

Simons's declaration establishes that Allerton was a California resident; Allerton was formed as a limited liability company under California law; Allerton was the other party to the Silverline agreement which was to be governed by California law; and Steverson negotiated between Allerton and Imperial, another California resident, a financing agreement, which was also to be governed by California law.

Moreover, Simons also stated in her declaration that "[a]t all times, she understood Steverson was representing her and Allerton as an attorney and that he "never informed [her] that he was merely a 'law clerk' as defendants asserted in their motions to quash." Steverson never controverted nor offered any competent evidence to contest this statement.

We also find erroneous the trial court's finding that it was significant and determinative that plaintiffs employed a New York law firm instead of a California one. On the contrary, the crucial fact is that defendant Rudolph & Beer, a New York law firm, employed Steverson, an attorney licensed to

practice law only in California, and not in New York, to represent plaintiffs, each of whom are California residents, concerning contracts to be governed by California law and involving other California residents, i.e., Silverline and Imperial. In so doing, Rudolph & Beer clearly sought to obtain benefits and exercise privileges which are peculiarly specific to California. Its status as a New York firm was thus totally irrelevant to the subject matter of plaintiffs' claims.

We further conclude that defendants failed to proffer any compelling circumstances which would render the exercise of personal jurisdiction over defendants by California unreasonable. The undisputed facts reveal that the only contact between New York and the plaintiffs' claims is defendants' residency in that state; except for defendants, all witnesses are California residents; California has a unique interest in interpreting and applying its own law, which govern the subject matter of plaintiffs' claims; and no other forum outside of California and New York has any interest whatever in the resolution of plaintiffs' claims. (See, e.g., *As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859, 1871-1872 [58 Cal.Rptr.2d 654].)

### DISPOSITION

The order granting defendants' motions to quash is reversed. Plaintiffs to recover costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.