**David P. JACOBSEN, et al., Plaintiffs,**

v.

**James J. OLIVER, et al., Defendants.**

**No. Civ.A. 01–1810(ESH).**

United States District Court,
District of Columbia.

April 29, 2002.

---

Paul Lawrence Knight, Washington, DC, for Plaintiffs.

George Alexander Lehner, Charles Henry Carpenter, Pepper, Hamilton L.L.P., Washington, DC, for Defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff David Jacobsen was kidnapped in 1985 in Beirut, Lebanon and held hostage for 532 days by a terrorist group that had been funded, supported, and controlled by the Iranian government. He, like several other hostages, sued in this Court. After entering a default against Iran, the Honorable Thomas Penfield Jackson entered judgment in the amount of $9 million, all of which Jacobsen recovered after Congress passed legislation in 2000 that permitted hostage victims, who had secured judgments prior to July 20, 2000, to recover compensatory damages in full. Now Jacobsen has sued his former attorneys, James J. Oliver, Carla E. Connor, and Barbara A. Barnes, and their law firm, Murphy Oliver Caiola & Gowen, P.C. (collectively "defendants"), complaining that his lawyers did not sue the Iranian

Ministry of Information and Security (hereinafter "MOIS") for punitive damages and that their 35% contingent fee was unreasonable and excessive. In his complaint, he alleges legal malpractice (Count I), breach of fiduciary duty for charging excessive fees (Count II), and breach of an implied covenant of good faith and fair dealing (Count III). David Jacobsen's three adult children, Eric and Paul Jacobsen and Diane Jacobsen Martinez (hereinafter the "Jacobsen Children"), have also brought suit, alleging malpractice (Count IV) and negligent misrepresentation (Count V) arising from defendants' failure to include them in their father's lawsuit.

Defendants have moved to dismiss, arguing that as a matter of law, defendants were not negligent because it was not foreseeable at the time of Jacobsen's suit that punitive damages would be recoverable, or alternatively, as a matter of public policy, damages are not available in a legal malpractice action to compensate plaintiffs for punitive damages that arguably would have been available in the underlying action. Defendants also argue that the claim regarding attorneys' fees is barred by *res judicata*, or alternatively, it should be dismissed because the fees are reasonable as a matter of law. With respect to the Jacobsen Children, defendants claim that this Court lacks personal jurisdiction, venue is improper, their claims are barred by the statute of limitations, and there was no attorney-client relationship between the Jacobsen Children and defendants.

For the reasons set forth below, the Court will deny the motion to dismiss as to David Jacobsen's claims in Counts I and II, but will grant the motion as to Count III. With respect to the Jacobsen Children's claims, the Court will grant the motion on the grounds that these claims

are time-barred, and therefore, Counts IV and V will be dismissed.

## FACTUAL BACKGROUND

This lawsuit traces back to events in Iran, when in 1985 the terrorist organization, the Hezbollah, abducted David Jacobsen along with Terry Anderson, Thomas Sutherland and Reverend Lawrence Jenco. The Hezbollah held Jacobsen as a hostage for 532 days until November 2, 1986. In 1992, Jacobsen and another former hostage, Joseph Cicippio, and his wife engaged defendant James Oliver and his law firm to pursue legal remedies for their injuries and losses caused by the Hezbollah's actions. (Defendant's Memorandum in Support of Defendants' Motion to Dismiss at 3 [hereinafter "Def.'s Mem."].) At the time, the availability of legal remedies was problematical, because the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, (hereinafter "FSIA") granted immunity from lawsuits to foreign states with only limited exceptions. Nonetheless, defendants brought suit in this Court in October 1992 on behalf of Jacobsen, Cicippio, and Cicippio's wife against the Islamic Republic of Iran under the FSIA.[1] *Cicippio v. Islamic Republic of Iran*, No. 92–cv–2300 (D.D.C.1992) (hereinafter *"Cicippio I "*). In 1993, Judge Jackson dismissed the suit without prejudice, concluding that defendants had not presented a viable legal claim under the FSIA. *Cicippio v. Islamic Republic of Iran*, 1993 WL 730748 (D.D.C. 1993), *aff'd*, 30 F.3d 164 (D.C.Cir.1994), *cert. denied*, 513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 631 (1995).

Subsequent to this dismissal, Jacobsen and defendants actively lobbied Congress and the Clinton administration to pass legislation that would allow for lawsuits

---

1. The lawsuit had to be brought here, because this Court has exclusive jurisdiction over law-

suits against foreign states under 28 U.S.C. § 1391(4).

against foreign states that sponsored terrorism. Ultimately, these efforts were successful. In April 1996, Congress passed the Anti–Terrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), Pub.L.No. 104–132, *codified at* 28 U.S.C. § 1605(a)(7), which amended the FSIA to allow for lawsuits against foreign states that sponsor terrorism. Jacobsen then signed a second engagement letter, and in July 1996, defendants refiled their suit against Iran on behalf of Jacobsen, Cicippio and his wife, and former hostage Frank Reed and his wife (hereinafter "*Cicippio II* "). The complaint sought compensatory damages of $100 million plus punitive damages against Iran only, but did not name any "agents or instrumentalities" of Iran.

Subsequent to the filing of *Cicippio II,* in September 1996, Congress enacted the "Flatow Amendment," which offered new causes of actions to victims of terrorism. *See* Civil Liability for Acts of State Sponsored Terrorism Act, Pub.L.No. 104–208 § 589, *codified at* 28 U.S.C. § 1605 note. The Amendment provided in relevant part:

> (a) An official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 [section 2405(j) of the Appendix to Title 50, War and National Defense] while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code [subsec. (a)(7) of this section] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were

among those described in section 1605(a)(7) [subsec. (a)(7) of this section]. The Flatow Amendment expressly provided victims of terrorism with a statutory basis for pursuing legal actions directly against agents and instrumentalities of Iran. In addition, the Flatow Amendment provided a statutory basis for recovery of "solatium" damages (*i.e.,* compensation for "hurt feelings or grief," including mental anguish, bereavement, and grief. BLACK'S LAW DICTIONARY 1397 (7th ed.1999)). Subsequent to passage of the Flatow Amendment, courts have allowed spouses and relatives in direct lineal relationship to victims of terror to pursue legal actions to recover solatium damages. *See, e.g., Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 29–33 (D.D.C.1998); *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27 (D.D.C.2001); *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C.2001); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000).

In *Cicippio II,* Iran did not appear to contest the claims, and in November 1997, Judge Jackson entered a default and agreed to schedule individual trials for each of the *Cicippio II* plaintiffs. Prior to Jacobsen's trial, the Honorable Royce C. Lamberth issued his ruling in *Flatow v. Islamic Republic of Iran,* in which he held that the Flatow Amendment allowed for punitive damages to be collected directly from a foreign state and awarded solatium damages to family members of Alisa M. Flatow. Disagreeing with *Flatow,* Judge Jackson ruled that the FSIA precluded an award of punitive damages against a foreign state, but he offered the *Cicippio* plaintiffs an opportunity to delay the trial so as to amend their complaint to name agents or instrumentalities. The *Cicippio* plaintiffs declined to amend their complaint, but instead, they withdrew their claim for punitive damages against Iran. (Def.'s Mem. at 7–8.) On August 27, 1998,

the Court awarded Jacobsen compensatory damages in the amount of $9,000,000 against Iran.

After trial, efforts were directed at trying to collect on the judgments. On October 28, 2000, the Victims of Trafficking and Violence Protection Act of 2000 became law. *See* Pub.L.No. 106–386, 114 Stat. 1541 (2000). It established procedures for collecting on judgments against terrorist states by allowing a victim of terrorism, who held, as of July 20, 2000, a final judgment against a terrorist state to receive compensation directly from the United States government. Section 2002(a)(1)(A) of the Act permitted a victim of terrorism to collect "110 percent of compensatory damages" provided he or she "relinquish all rights and claims to punitive damages," and section 2002(a)(1)(B) allowed compensation of "100 percent of compensatory damages," but permitted a victim to continue to pursue the recovery of punitive damages that had been awarded. *See Flatow v. Islamic Republic of Iran*, 201 F.R.D. 5, 10–11 (D.D.C.2001).

It is against this backdrop that Jacobsen and his children bring this action. In their complaint, David Jacobsen complains that defendants were negligent in failing to sue agents or instrumentalities of Iran for punitive damages, and the Jacobsen Children claim that defendants negligently advised them, via their father, that they had no legal basis to be joined as plaintiffs in the *Cicippio* litigation.

## LEGAL ANALYSIS

### I. DAVID JACOBSEN'S CLAIMS

■ This Court first considers defendants' motion to dismiss the counts

brought on behalf of Jacobsen—Count I alleging professional malpractice, Count II alleging breach of fiduciary duty, and Count III alleging breach of implied covenant of good faith and fair dealing.[2]

### A. Standard of Review

Because this Court need not rely on any materials outside the pleadings—other than matters of public record—in making its determination, this matter will be decided as a motion to dismiss, not a motion for summary judgment. Under Rule 12(b)(6), dismissal is appropriate only where a defendant has "show[n] 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1442 (D.C.Cir.1989) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding a motion to dismiss, the Court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiffs." *Fitts v. Federal Nat'l Mortgage Ass'n*, 44 F.Supp.2d 317, 321 (D.D.C.1999). However, the Court need not accept plaintiffs' legal conclusions as true. *See Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C.Cir. 1998). If the Court determines that "no relief could be granted under any set of facts that could be proved consistent with [plaintiffs'] allegations," the case must be dismissed under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

---

**2.** The Court will dismiss Count III, since it is identical to Count I, and there is no independent cause of action for an implied covenant of good faith and fair dealing with respect to an attorney's representation of a client. *See, e.g., Northview Motors, Inc. v. Chrysler Motors*

*Corp.*, 227 F.3d 78 (3d Cir.2000) ("[A] party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'") (citation omitted).

## B. Applicable Law

Before determining whether Jacobsen has stated a claim, this Court must determine what state's law applies. "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Ideal Electronic Security Co., Inc. v. International Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C.Cir.1997). In resolving choice of law questions, the District of Columbia employs a governmental interests approach, which balances the competing interests of the jurisdictions. *Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n. 2 (D.C.1985). To determine the jurisdiction with the greater interest, the Court considers four factors: (i) the place of the injury, (ii) the place where the conduct occurred, (iii) the domicile of the parties, and (iv) the place where the relationship between the parties is centered. *Myers v. Gaither*, 232 A.2d 577, 583 (D.C.1967). *See also Estrada*, 488 A.2d at 1361 n. 2 (citing Restatement (Second) of Conflicts § 145).

In applying these factors to the instant facts, this Court finds that out of the three jurisdictions that have an interest in this case, the District of Columbia has the greatest interest. While the place where Jacobsen's injury would have occurred was California, where he lived, and certain conduct allegedly causing the injury, specifically advice given via telephone, occurred in Pennsylvania, where defendants reside and practice law, the District of Columbia has the most substantial relationship to Jacobsen's claims. The District, which was the locus of both *Cicippio* actions, can fairly be said to be the place where the relationship between the parties was centered. Defendant Oliver was twice admitted to the District *pro hac vice*, and defendants made numerous court filings and appearances in the *Cicippio* cases,

including representing Jacobsen at his trial in this Court. Jacobsen and defendants met in the District to discuss the case, and as defendants concede, "the final key conversation—when Jacobsen agreed *not* to pursue individuals as defendants—took place in the courthouse in Washington, DC." (Def.'s Mem. at 13.) Furthermore, as plaintiff argues, the action necessary to correct an alleged omission of not joining an "agency or instrumentality" of Iran would have been to file an amended complaint in the District. (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss for Failure to State a Claim for which Relief May Be Granted at 8 [hereinafter "Pl.'s Opp."].)

In reaching this conclusion, the Court finds the case cited by plaintiff, *David B. Lilly Co. Inc. v. Fisher*, 18 F.3d 1112 (3d Cir.1994), to be instructive, since it, like the instant case, involved "relational strands span[ning] several states." *Id.* at 1120. Nonetheless, the Third Circuit concluded that locations where allegedly negligent attorneys performed their legal work structuring a transaction (i.e., Washington, D.C. and New York) had "little relationship to either the alleged legal malpractice or the parties." *Id.* Instead, the court found significance in the "purpose of the relationship" between the law firm and its client, which was to facilitate an acquisition of a Delaware corporation and concluded ultimately that Delaware had the most significant relationship to the malpractice claim and the parties. *Id.* Here, the purpose of the relationship was to bring an action under the FSIA in the District, and thus, the District has the most significant relationship to Jacobsen's claims.

Moreover, while Pennsylvania admittedly has an interest in regulating the conduct of its attorneys, the District has a compelling and overriding interest in regulating the conduct of attorneys who prac-

tice within its borders. *See Crossland Savings FSB v. Rockwood Insurance Co.*, 692 F.Supp. 1510, 1512 (S.D.N.Y.1988) (holding that interest of New York in regulating conduct within its borders outweighs interest of Texas in regulating professionals licensed to practice in Texas) (citing, *inter alia, Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir.1986)). Moreover, even if Pennsylvania's interest is equal to that of the District, the District's laws are to be applied in accordance with this Circuit's conflict of law principles. " 'Where each state would have an interest in application of its own law to the facts, . . . the law of the jurisdiction with the stronger interest will apply.' . . . 'If the interests of the two jurisdictions in the application of their law are equally weighty, the law of the forum will be applied.' " *Williams v. First Government Mortgage & Investors Corp.*, 176 F.3d 497, 500 (D.C.Cir.1999) (citing *Bledsoe v. Crowley*, 849 F.2d 639, 641, 641 n. 1 (D.C.Cir.1988)).

## C. Is There Compensable Injury?

■ Defendants argue that punitive damages cannot be assessed as a matter of public policy against "someone who has not acted in an outrageous manner, unless doing so will deter others from engaging in like conduct." (Def.'s Mem. at 16.) Plaintiff responds that he is not prohibited from recovering as compensatory damages in a legal malpractice case for the loss of what would have been available as punitive damages in the underlying case. (Pl.'s Opp. at 21.)

This issue—that of so-called "lost punitives"—is a matter of first impression in this jurisdiction, but is one as to which courts disagree. *Compare Haberer v. Rice*, 511 N.W.2d 279 (S.D.1994) (in legal malpractice action against former attorney, a client can recover what would have been punitive damages in underlying action); *Merenda v. Superior Court*, 3 Cal. App.4th 1, 4 Cal.Rptr.2d 87 (Cal.Ct.App. 1992) (same); *Scognamillo v. Olsen*, 795 P.2d 1357 (Colo.App.1990) (same); *Ingram v. Hall, Roach, Johnston, Fisher & Bollman*, 1996 WL 54206 (N.D.Ill.1996) (same); *Hunt v. Dresie*, 241 Kan. 647, 740 P.2d 1046 (1987) (same) *with Cappetta v. Lippman*, 913 F.Supp. 302 (S.D.N.Y.1996) (in legal malpractice action against former attorney, a client cannot recover what would have been punitive damages in underlying action); *Summerville v. Lipsig*, 270 A.D.2d 213, 704 N.Y.S.2d 598 (N.Y.App.Div.2000) (same) (citing *Cappetta*); *Piscitelli v. Friedenberg*, 87 Cal. App.4th 953, 979–983, 105 Cal.Rptr.2d 88 (Cal.Ct.App.2001) (same) (taking issue with decision in *Merenda*); *Ferguson v. Lieff, Cabraser, Heimann & Bernstein LLP*, 95 Cal.App.4th 154, 166, 115 Cal.Rptr.2d 342 (Cal.Ct.App.2002) (same) (citing *Piscitelli*).

By statute, this Court has no authority to certify this issue to the District of Columbia Court of Appeals, *see* D.C.Code § 11–723, and thus, it must attempt to predict how the issue would be resolved by that court.[3] Both Jacobsen and defendants argue for positions based on legitimate but competing policy considerations: Jacobsen argues that he can only be made "whole" if he can recover the entire value of the claim lost, which must include an

---

**3.** As Pennsylvania has not decided this issue either, the question of what law to apply in this regard is arguably moot, for the District of Columbia and Pennsylvania have similar negligence laws, and a Pennsylvania court relying on Pennsylvania law would ultimately have to consider the same competing policy considerations and conflicting case law in reaching its decision. Given the similarities between the two jurisdictions, this Court believes that a Pennsylvania court would reach the same outcome under Pennsylvania law as it has reached here under District of Columbia law.

amount for punitive damages, while defendants argue that collection of such "lost punitives" from attorneys runs counter to the deterrent and punitive purposes of punitive damages.

Based on a consideration of the case law and commentary, this Court concludes that the approach advocated by plaintiff is preferable, and therefore, Jacobsen may sue to recover as compensatory damages those damages that would have been available as punitive damages in his underlying action. In their treatise on legal malpractice, Richard E. Mallen and Jeffrey M. Smith support such a view:

> Attorneys can be liable for exemplary or punitive damages lost or imposed because of their negligence. If the client should have recovered exemplary damages in the underlying action but for the attorney's wrongful conduct, then such a loss should be recoverable in the malpractice action as direct damages.

Ronald E. Mallen & Jeffrey M. Smith, 3 *Legal Malpractice* § 20.7, at 136–137 (5th ed.2000). Professor Monroe H. Freedman also endorses this position. *See* Monroe H. Freedman, *Caveat Lector: Conflicts of Interest of ALI Members in Drafting the Restatements*, 26 Hofstra L.Rev. 641, 652 (1998) (citing as support the language of section 75 of the Restatement (Third) of The Law Governing Lawyers: "A lawyer . . . is liable for injury of which the lawyer's breach of a duty of care was the legal cause, as determined under generally applicable principles of causation and damages." Restatement (Third) of The Law Governing Lawyers § 75, at 60 (Tentative Draft No. 8, 1997)). *See also* John J. Kircher & Christine M. Wiseman, 2 *Punitive Damages: Law and Practice* § 17:8 (2d ed. 2000) ("Of course, in a legal malpractice action, punitive damages are recoverable as an element of compensatory damages if, as a result of the attorney's

negligence, the plaintiff suffers an award or is prevented from recovering an award against a defendant in the underlying action.") (citing *Scognamillo, supra* ).

The Court is not persuaded by the logic of defendant's leading case, *Piscitelli*, 87 Cal.App.4th at 979–983, 105 Cal.Rptr.2d 88, where an award of punitive damages was overturned, because "punitive damages are not compensation for injury," but are " 'private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence.' " *Id.* at 981, 105 Cal.Rptr.2d 88 (citation omitted). *Piscitelli* found the *Merenda* Court's reasoning "flawed" when "characteriz[ing] a punitive damage claim as a 'loss' for which a legal malpractice plaintiff may be compensated in order to make her 'whole.' " *Id.* While it is true that the purpose of punitive damages is not to compensate victims, but rather is to punish bad actors and deter future wrongdoing, as Professor Freedman points out, "[t]he issue is not the purpose of punitive damages, but the purpose of compensatory damages, which is to give the client what she lost because of the lawyer's negligence. . . . Essentially, as a result of the lawyer's negligence, the punitive damages recoverable from the original tortfeasor become compensatory damages recoverable from the lawyer." 26 Hofstra L.Rev. at 653. For, as the Supreme Court of Kansas recognized in *Hunt*, a negligent attorney's liability "include[s] damages called punitive damages from the vantage point of th[e underlying lawsuit.] From the vantage point of [the malpractice] lawsuit, . . . all the damages are simply those which proximately resulted from [the] attorneys' negligence." 740 P.2d at 1057.

While allowing recovery of so-called "lost punitives" against attorneys does not directly punish the wrongdoer, it may, at least in an indirect way, further the goal of deterrence. Attorneys who appreciate

that they will be liable in malpractice actions for "lost punitives" will be motivated to exercise reasonable care in investigating or defending punitive damages claims. *See Hunt,* 740 P.2d at 1057 ("[If such claims are not allowed], then any attorney representing a client who might be assessed punitive damages in a lawsuit could rest easy, secure in the knowledge that any improper handling of the suit, even intentional actions, could not subject the attorney to any malpractice liability at all."). Moreover, permitting recovery of punitive damages as compensatory damages in a legal malpractice action is consistent with this jurisdiction's law regarding damages for negligence—"[t]he normal measure of tort damages is the amount which compensates the plaintiff for all of the damages proximately caused by the defendant's negligence." *Haymon v. Wilkerson,* 535 A.2d 880, 885 (D.C.1987).

## D. Has Jacobsen Stated a Claim for Negligence?

Defendants also move to dismiss on the grounds that plaintiff cannot prove negligence, because the harm was not "reasonably foreseeable" (Def.'s Mem. at 14), since "only the deadline [of July 20, 2000, the date established by Congress in Victims of Trafficking and Violence Protection Act of 2000 guaranteeing compensation] gives rise to injury." (Reply Brief in Support of Motion to Dismiss at 5 [hereinafter "Def.'s Rep."].) Defendants, however, misconstrue Jacobsen's argument: the gravamen of his complaint is not—as defendants claim— that "the Firm did not obtain a judgment for punitive damages against some party by July 20, 2000." (*Id.*) Indeed, the Complaint makes clear that Jacobsen's claim is much broader in scope:

> The Murphy Oliver Defendants' failure to name agents and instrumentalities of

Iran as defendants, which precluded David Jacobsen's ability to secure a substantial and uncontested award of punitive damages in his favor, was a breach of [defendants'] duty to exercise reasonable care, skill, and diligence.... Solely as the proximate result of the [defendants'] negligence, Plaintiff David Jacobsen has been damaged in the sum of $300,000,000, plus interest.

(Complaint at ¶¶ 52–53.) Thus, at this stage, taking as true plaintiff's allegations, this Court cannot conclude that Jacobsen has failed to allege a claim of negligence based on lack of foreseeability. Therefore, defendants' motion to dismiss on this ground is denied.[4]

## E. Attorneys' Fees

Defendants also move to dismiss plaintiff's challenge to the amount of the contingent fees charged on the grounds that it is barred by *res judicata,* or in the alternative, the fee is, as a matter of law, reasonable. The Court cannot agree with either argument.

### 1. *Res Judicata*

" 'Under the claim preclusion aspect of res judicata, a final judgment on the merits in a prior suit involving the same parties or their privies bars subsequent suits based on the same cause of action.' Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim.' " *NextWave Personal Communications Inc. v. FCC,* 254 F.3d 130, 143 (D.C.Cir.2001) (citation omitted). The three elements of *res judicata* are: (i) a final judgment on the merits in the first action; (ii) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding;

---

**4.** Given the disputed issues of fact raised by plaintiffs, the Court need not address the issue of whether punitive damages are collectible.

and (iii) the party against whom res judicata is asserted was a party or in privity with a party in the previous case. *See Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

■ Without any citation to case authority, defendants argue that plaintiffs' claims regarding attorneys' fees are barred by *res judicata*, because of Judge Jackson's October 12, 2000 Order regarding the payment of attorneys' fees and the entry of a charging lien in defendants' favor. However, the issue of the reasonableness of the fees was not before Judge Jackson: the defendants herein were not parties to the prior suit, the issue of fees was never raised in that suit, and Judge Jackson's Order does not address the issue.[5] Nonetheless, defendants attempt to imply *res judicata*, based on the fact that the Court concurrently filed a May 5, 2000 letter from Jacobsen regarding his disappointment with defendants' representation when it filed its October 12, 2000 Order. (Def.'s Mem. at 26.)[6] However, this letter is silent as to the issue of fees. Defendants cannot, therefore, invoke the doctrine of *res judicata.*

### 2. The Reasonableness of Attorneys' Fees

■ Alternatively, defendants argue, again without any supporting law, that this Court should conclude that the agreed-upon contingent fee of thirty-five percent of any recovery is reasonable as a matter of law. Resolution of this matter involves a factual inquiry that cannot be undertaken at this early stage. As noted by the Restatement (Third) of The Law Governing Lawyers, "[a] lawyer may not charge a fee larger than is reasonable in the circumstances or that is prohibited by law," and there are three questions that guide the factual inquiry regarding reasonableness of fees: (i) "when the contract was made, did the lawyer afford the client a free and informed choice?"; (ii) "does the contract provide for a fee within the range commonly charged by other lawyers in similar representations?"; and (iii) "was there a subsequent change in circumstances that made the fee contract unreasonable?"[7] Restatement (Third) of The Law Governing Lawyers § 34 (1998). To answer these queries, one must necessarily await the completion of discovery so that factual determinations can be made.

## II. THE JACOBSEN CHILDREN'S CLAIMS

### A. Jurisdiction

■ Pursuant to Fed.R.Civ.P. 12(b)(2), defendants move to dismiss the

---

5. The Order states as follows:
   [I]t is hereby ORDERED and DECREED that any and all monies made available to plaintiff, David P. Jacobsen, to satisfy the judgment previously rendered against the Islamic Republic of Iran in this case, from any source, be paid directly to counsel for plaintiffs for distribution, less attorneys' fees of thirty-five percent and costs. It is further ORDERED that a charging lien is entered in favor of petitioner, Murphy, Oliver, Caiola & Gowen, P.C. against said monies in the amount of thirty-five percent of the judgment, as agreed upon in the contingency agreement entered into between petitioner and plaintiff, David P. Jacobsen.

*Cicippio I*, No. 1:96–cv–01805 RCL, Order (D.D.C. October 12, 2000).

6. On October 12, 2000, Judge Jackson also filed the May 12, 2000 letter that he wrote in response to Jacobsen's letter. (Oliver Declaration at ¶ 57; Def.'s Mem.Ex. C.)

7. The only case cited to by defendants is distinguishable from this case, because it is a Third Circuit case affirming the granting of a motion for summary judgment. *See Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210 (3d Cir.1999).

Jacobsen Children's claims on the grounds that the Court lacks personal jurisdiction over them. Plaintiffs have the burden of proof to establish that the Court has personal jurisdiction. *Dooley v. United Tech. Corp.*, 786 F.Supp. 65, 70 (D.D.C.1992). This burden is "only a minimal [one]." *Abramson v. Wallace*, 706 F.Supp. 1, 2 (D.D.C.1989). All factual disputes concerning jurisdiction must be resolved in favor of plaintiffs, *see Crane v. New York Zoological Soc.*, 894 F.2d 454, 456 (D.C.Cir.1990), and plaintiffs need only make a *prima facie* showing of personal jurisdiction in order to defeat defendants' motion. *See Mitchell Energy Corp. v. Mary Helen Coal Co.*, 524 F.Supp. 558, 561 (D.D.C.1981).

■ The Jacobsen Children have met their minimal burden as to defendants Oliver and his law firm. They have established that the Court has personal jurisdiction over these defendants pursuant to the District of Columbia's long-arm statute, D.C.Code § 13–423(a)(1), which provides in relevant part:

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—(1) transacting any business in the District of Columbia.

To meet their burden, the Jacobsen Children must satisfy a four-part test establishing that:

(i) the defendant transacted business in the District;

(ii) the claim arose from the business in the District;

(iii) the defendant had minimum contacts with the jurisdiction; and

(iv) the Court's exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

*Formica v. Cascade Candle Co.*, 125 F.Supp.2d 552, 553 (D.D.C.2001) (internal quotation marks and citation omitted). Defendants argue that the Jacobsen Children have failed to satisfy two of the four prongs of this jurisdictional test: (i) that the Jacobsen Children's claims do not arise from nor are they sufficiently related to defendants' conduct in the District, and (ii) that personal jurisdiction would offend the "traditional notions of fair play and substantive justice," because the defendants could not reasonably have anticipated being haled into a court in the District of Columbia by the Jacobsen Children and because the interests of the forum are reduced, as the Jacobsen Children are not D.C. residents. (Def.'s Mem. at 28–33.) While it is a close question, the Court is ultimately persuaded that there are sufficient facts to sustain a finding of jurisdiction.

This Court's analysis is informed by the seven principles guiding personal jurisdiction jurisprudence, as discussed by the District of Columbia Court of Appeals in *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C.2000). These principles are: (1) section 14–423(a)(1) is coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution; (2) there are no "mechanical tests" or "talismanic formulations" for determining personal jurisdiction, and the facts of each case must be weighed against the notions of fairness, reasonableness, and substantial justice; (3) a court must examine the quality and nature of a nonresident defendant's contacts with the District and whether those contacts are voluntary and deliberate or only random, fortuitous, tenuous, and accidental; (4) where a nonresident defendant has purposefully availed itself of the benefits and protections of the District in engaging in business activity in the forum jurisdiction, it is fair and reasonable to expect it to

anticipate being sued in that jurisdiction; (5) in examining the nonresident defendant's contacts with the District, the focus is placed on the relationship among the defendant, the forum, and the litigation; (6) it is reasonable and fair to exercise specific jurisdiction where a nonresident defendant has purposefully directed its activities at District residents, and claims against it by a District resident "arise out of or relate to" or have "a substantial connection" with the business transacted in the District; and (7) the District has a manifest interest for providing a convenient forum in which residents may seek relief against nonresidents, especially where litigation would not impose an undue burden on the nonresident defendant. *Id.* at 329.

■ Applying these principles to the particular facts of this case, it is noteworthy that defendants do not dispute that they transacted business in the District of Columbia with respect to their representation of Jacobsen and others in *Cicippio I* and *Cicippio II*. Rather, they challenge personal jurisdiction with respect to his children's claims. Thus, this Court need not address in detail the quality and nature of defendants' contacts with the District, for the facts regarding defendants' business activities in the District are not disputed. While prior to this lawsuit, defendants had no contacts with the District,

and defendants have never and do not currently maintain an office, own property, advertise, or employ agents or other representatives in the District, they did engage in a series of activities within the District of Columbia relating to their representation of former Iranian hostages, including Jacobsen. These activities began in October 1992 with the filing of *Cicippio I* and continued through 1998 when Judge Jackson awarded monetary damages against Iran in *Cicippio II*. In addition. in order to practice in the District, Oliver v as admitted *pro hac vice* on two occasions. (Oliver Declaration at ¶ 7.) [8]

What this Court must examine is whether defendants' alleged provision of legal advice to the Jacobsen Children "arose out of" these activities, and secondly whether the exercise of personal jurisdiction would offend "traditional notions of fair play and substantial justice." *Formica,* 125 F.Supp.2d at 553. In *Shoppers Food Warehouse,* 746 A.2d at 333, the District of Columbia Court of Appeals interpreted the phrase "arise from" broadly and established a "flexible" nexus test to determine when claims can be said to "arise from" contacts with the forum. This Court must interpret the "arise from" language of § 13–423 to be consistent with Supreme Court jurisprudence that considers the phrase "arise from" to be synonymous

---

**8.** During these years, defendants engaged in lobbying activities in the District, including the lobbying of members of Congress and the Executive branch in an effort to convince the government to amend the FSIA to provide a cause of action for former hostages. This Court cannot consider such lobbying activities when deciding the issue of personal jurisdiction. Under the so-called "government contacts exception" to the long-arm statute, defendants' lobbying activities do not amount to the transaction of any business in the District of Columbia. *See Environmental Research International, Inc. v. Lockwood Greene Engi-*

*neers, Inc.,* 355 A.2d 808, 813 (D.C.1976) (*en banc* ) ("To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum."); *see also Lex Tex Ltd., Inc. v. Skillman,* 579 A.2d 244, 245 (D.C. 1990). The "government contacts" exception, however, does not extend to defendants' business activities before a court.

with the phrases "relate to" or having a "substantial connection with." *Id.* at 335.[9]

Here, plaintiffs do not contend that defendants gave allegedly negligent advice to them while either party was located in the District. Rather, plaintiffs concede that defendants, Pennsylvania residents, formulated and provided their advice to the Jacobsen Children, California residents, while defendants were located in their office in Norristown, Pennsylvania. Nevertheless, under the flexible standard established in *Shoppers Food Warehouse,* and based on the facts viewed in a light most favorable to the Jacobsen Children, the children's claims can fairly be said to "arise out of" defendants' activities in the District, for defendants allegedly provided negligent legal advice regarding an ongoing lawsuit in the District in which their father was involved.[10] According to their complaint (¶¶ 38–39), Oliver undertook to represent the Jacobsen Children by providing legal advice to them when responding to their father's inquiry on their behalf, and the negligent legal advice related to their inability to join the lawsuit in the District that defendants had initiated and were litigating on behalf of their father.

While the Jacobsen Children do not present any facts establishing that defendants' forum activities were directed at them or conducted on their behalf, they are not required to do so. In *Vons Companies, Inc. v. Seabest Foods, Inc.,* 14 Cal.4th 434, 58 Cal.Rptr.2d 899, 926 P.2d 1085 (1996), the Supreme Court of California, when applying a flexible nexus test

similar to that adopted in *Shoppers Food Warehouse,* 746 A.2d at 333–34, stated:

> [D]efendant's forum activities need not be directed at the plaintiff in order to give rise to specific jurisdiction. . . . The United States Supreme Court has stated more than once that the nexus required to establish specific jurisdiction is between the defendant, the forum, and the litigation . . .—not between the plaintiff and the defendant.

*Vons Companies, Inc.,* 58 Cal.Rptr.2d 899, 926 P.2d at 1100 (citations omitted); *see also Akro Corp. v. Luker,* 45 F.3d 1541, 1547 (Fed.Cir.1995) (plaintiff need not be a forum resident toward whom any, much less all, of defendant's forum activities were purposefully directed); *In re Oil Spill by Amoco Cadiz Off Coast of France,* 699 F.2d 909, 917 (7th Cir.1983) (French victims of oil spill entitled to bring tort action against Spanish shipbuilder in Illinois court, even when negotiations of Illinois contract were clearly not directed at plaintiffs). *See also Simons v. Steverson,* 88 Cal.App.4th 693, 710, 106 Cal.Rptr.2d 193 (Cal.Ct.App.2001) (" '[D]efendant's forum activities . . . need not be directed at the *plaintiff* in order to give rise to specific jurisdiction.' . . . [A]s long as the claim bears a substantial relationship to the nonresident's forum contacts, the exercise of specific jurisdiction is appropriate.") (citing *Vons Companies,* 58 Cal.Rptr.2d 899, 926 P.2d at 1085).

Here, the allegedly negligent advice— while not directed at the Jacobsen Children—related to defendants' activities

---

9. The Supreme Court has formulated the nexus requirement between a plaintiff's claim and a defendant's business activities in the disjunctive, stating that the claim for relief must result "from alleged injuries that 'arise out of or relate to' those activities." *Shoppers Food Warehouse,* 746 A.2d at 333 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

10. Defendant Oliver admits to asking Jacobsen whether he had minor children, but denies that he ever gave Jacobsen any advice regarding the validity of any legal claim on behalf of his adult children. (Def.'s Mem. at 19–20; Oliver Declaration at ¶ 5.)

within the District. But for defendants' activities in the District, the Jacobsen Children would not have sought legal advice. The *Cicippio* lawsuits represented an ongoing concern in which defendants had a significant interest and devoted large amounts of time over a substantial number of years. Since this Court was the only available venue where suit could be brought against Iran, defendants' alleged legal advice necessarily related to the bringing of a claim in the District of Columbia. *See* 28 U.S.C. § 1391(f)(4). Indeed, if defendants had sought to include the Jacobsen Children in the *Cicippio II* action, they would have had to perform legal services in this jurisdiction on their behalf.

Under somewhat similar, though admittedly not identical, facts, the District of Columbia Court of Appeals has found jurisdiction in a legal malpractice case brought by a non-resident plaintiff corporation that had engaged a non-resident attorney to represent the corporation before the United States Patent and Trademark Office. *See Lex Tex Ltd., Inc.,* 579 A.2d at 249. The attorney's activities in the District were deemed to fall within the usual meaning of "transacting business" as the attorney had appeared personally before the Patent and Trademark Office to represent his client's interest. *Id.* at 249. Of note, the Court observed: "One can hardly demand the right to come to the District of Columbia to pursue activities exclusively on behalf of an out-of-state principal and expect to be absolutely immune from suit here by that principal for causes of action arising out of the performance of such activities." *Id.* at 250. While it is true that defendants here, unlike those in *Lex Tex,* never actually performed services in the District for the Jacobsen Children, it is still arguable that the alleged failure to include them in an ongoing suit in this jurisdiction exposes defendants to suit here.

Defendants' comparison to the pre-*Shoppers Food Warehouse* case, *Trerotola v. Cotter,* 601 A.2d 60 (D.C.1991), is inapposite. In *Trerotola,* the court determined that an implied-in-fact contract to give a gift to plaintiff arose in Maryland and not from the defendant employer's activities or obligations in the District, and there was no affirmative act by the employer directing or relating to any gift which had direct consequences in the District so as to establish minimum contacts. *Id.* at 65. By contrast, in this case, one can fairly conclude otherwise, for the allegedly negligent advice arose out of and related to defendants' activities in the District, and therefore, plaintiffs' claim has the required relationship to defendants' activities in the District to meet the due process requirements for personal jurisdiction.[11]

The Court must lastly consider whether exercising jurisdiction in the District comports with "traditional notions of fair play and substantial justice." Once the Court has concluded that there are sufficient minimum contacts, the burden shifts to the defendants to present "a compelling case that the presence of some other consider-

---

**11.** Oliver acted as an agent of the law firm when conducting his activities in the District and when he allegedly gave legal advice to the Jacobsen Children. Thus, this Court finds personal jurisdiction over the firm to be proper. *See, e.g., Richter v. Analex Corp.,* 940 F.Supp. 353, 360 (D.D.C.1996) (finding accounting firm transacted business to establish jurisdiction based on actions of firm member in forum). Nevertheless, the Jacobsen Children do not allege that defendants Barnes or Connor had any role in providing negligent advice to them, and therefore, the Jacobsen Children's claims as to these two defendants must be dismissed. *See id.* at 359–60 (dismissing claim against one of two firm members, because his work could not have caused the alleged injury).

ations would render jurisdiction unreasonable." *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. Defendants have failed to present such facts, as they had "fair warning" that they could be sued by the Jacobsen Children in the District. *Id.* at 472, 105 S.Ct. 2174; *see also World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (quoting *Intl. Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ("The relationship between defendant and the forum must be such that it is 'reasonable ... to require the corporation to defend the particular suit which is brought there.' ")). Defendants purposefully availed themselves of the privilege of conducting activities within the District, and it is therefore reasonable for them to expect that they could be haled into court here by the Jacobsen Children. *See World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559.

In considering the District's "interest in adjudicating the dispute," *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559, the Court appreciates that the Jacobsen Children are not residents of the District and that typically where plaintiffs are not residents of the forum, the forum state's "legitimate interests in the dispute have considerably diminished." *Asahi Metal Industry Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *see also Shoppers Food Warehouse,* 746 A.2d at 328 ("A State generally has a manifest interest in providing *its residents* with a convenient forum for redressing injuries inflicted by out-of-state actors.") (emphasis added) (citations and quotation marks omitted). Indeed, if the Jacobsen Children were residents of the District, this would be a much easier decision for the Court. Nevertheless, this Court must take into account the *sui generis* nature of this lawsuit. The *Cicippio* plaintiffs brought their suit in the District of Columbia, rather than in another forum, because a federal statute established this Court as the only forum where such a suit against a foreign state could be brought. *See* 29 U.S.C. § 1391(f)(4). Thus, the District maintains an interest in adjudicating this case, because it relates to an underlying action against a foreign state brought under the FSIA. *See Flatow,* 999 F.Supp. at 6 (noting "this Court's special role in the development of foreign sovereign immunity jurisprudence").

## B. Venue

■■■ In addition to challenging jurisdiction, defendants argue that the Jacobsen Children's claims should be dismissed because of improper venue under 28 U.S.C. § 1391(a)(2), which provides that an action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred." *See Dooley v. United Tech. Corp.,* 786 F.Supp. 65, 80 (D.D.C.1992). In 1990, Congress amended § 1391(a) by adding the more expansive language of § 1391(a)(2) in an effort to avoid wasteful litigation when different forums were involved in a dispute. *See Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir.1994). Accordingly, plaintiffs are not required to establish that the District of Columbia has the most substantial contacts to the dispute, but rather only that "a substantial part of the events occurred" here. Indeed, a court no longer must determine which forum represents the "best" venue. *See Uffner v. La Reunion Francaise, S.A.,* 244 F.3d 38, 42 (1st Cir.2001); *see also First Michigan Corp. v. Bramlet,* 141 F.3d 260, 263 (6th Cir. 1998) (citing *Setco Enterprises Corp. v. Robbins,* 19 F.3d 1278, 1280–81 (8th Cir. 1994); *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 866–868 (2d Cir.1992); *Cottman Transmission Sys., Inc.,* 36 F.3d at 294). Therefore, venue in the District of Colum-

bia is proper, even if it might also be proper elsewhere.

While certain activities took place outside of the District, it is clear that relevant events also occurred in the District of Columbia. Of significance to finding the District as a proper venue is the fact that if defendants had sought to join the Jacobsen Children to the *Cicippio II* action, they would have had to perform legal services in the District on their behalf. Furthermore, in order to prove their claims, the Jacobsen Children would be required to prove that they would have recovered judgments in this Court in the underlying *Cicippio II* lawsuit. For these reasons, venue is proper here.

## C. Statute of Limitations

Defendants argue that the Jacobsen Children's claims must be dismissed on the grounds that they are time-barred, for the Jacobsen Children failed to file their lawsuit within the three-year period from the time their action accrued under D.C.Code § 12–301. A claim accrues when the actual injury occurs. *See Williams v. Mordkofsky,* 901 F.2d 158, 162 (D.C.Cir.1990). The statute of limitations on a tort claim ordinarily begins to run when plaintiffs sustain a tortious injury, but under the "discovery rule," it begins to run when plaintiffs know or reasonably should know that the cause of action exists. *See Morton v. Nat'l Med. Enter., Inc.,* 725 A.2d 462, 468 (D.C.1999). In other words, under the discovery rule, a cause of action accrues when plaintiffs have knowledge or by the exercise of reasonable diligence should have knowledge of (i) the existence of the injury; (ii) its cause in fact; and (iii) some evidence of wrongdoing. *See Ray v. Queen,* 747 A.2d 1137, 1141 (D.C.2000). Thus, a cause of action accrues when a plaintiff is on inquiry notice. The Court employs an objective

standard in evaluating whether the Jacobsen Children were on inquiry notice. *See Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 548 (6th Cir.2000) (citing *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1254 (1st Cir.1996); *Whirlpool Fin. Corp. v. GN Holdings, Inc.,* 67 F.3d 605, 609 (7th Cir. 1995); *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1417 (9th Cir.1987)).

The Court is mindful of the Circuit Court's guidance when considering motions to dismiss based on statute of limitations grounds. *See, e.g., Richards v. Mileski,* 662 F.2d 65, 73 (D.C.Cir.1981) ("We do not hold that the use of a motion to dismiss is always improper to raise a statute of limitations defense, but we do suggest that a responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when he relies on a motion to dismiss to raise such an affirmative defense.") Therefore, defendants, as the moving party, bear a heavy burden here, for "a motion to dismiss may be granted on the basis that the action is time-barred only when it appears from the face of the complaint that the relevant statute of limitations bars the action." *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1115 (D.C.Cir.1985).

This case, however, is unusual, for there are no outstanding factual issues in dispute that would preclude the resolution of this issue on a motion to dismiss. *See Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1408 (S.D.N.Y.1996) (granting motion to dismiss based on statute of limitations grounds in a securities fraud action because SEC filings and press releases put plaintiffs on inquiry notice) ("[T]he test [for inquiry notice] is an objective one and dismissal [on a motion to dismiss] is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures them-

selves."); *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 352 n. 3 (2d Cir.1993) ("Where ... the facts needed for determination when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate."); *Brumbaugh v. Princeton Partners,* 985 F.2d 157, 162 (4th Cir.1993) ("Where the underlying facts are undisputed, the issue of whether the plaintiff has been put on inquiry notice can be decided as a matter of law.") (citing *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987)).

■ In deciding this motion to dismiss, the Court may consider extra-record materials, such as matters of public record and previous filings with the Court. *See Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1222 (D.C.Cir.1993); *see also Siebert v. Nives,* 871 F.Supp. 110, 114 (D.Conn.1994) (upon determining inquiry notice in securities fraud action, court considered certain documents outside the pleadings which plaintiffs had in their possession or had knowledge of and relied upon in bringing suit). "[W]here a document is referred to in the complaint and is central to plaintiffs claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Vanover v. Hantman,* 77 F.Supp.2d 91, 98 (D.D.C. 1999) (citing *Greenberg v. The Life Insurance Company of Va.,* 177 F.3d 507, 514 (6th Cir.1999)); *see also Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (holding that district court may consider stock purchase agreement, offering memorandum, and warrant, on a motion to dismiss, even when these material were not attached to complaint).

■ In an attempt to stave off defendants' motion to dismiss, the Jacobsen Children have filed affidavits stating that they only discovered that they had been given allegedly negligent advice by defendants upon learning in December 1999 that three adult daughters of another hostage, Thomas Sutherland, had filed a suit in the District of Columbia for solatium damages. (*See* Eric Jacobsen Affidavit ¶ 7; Paul Jacobsen Affidavit ¶ 8; Pl.'s Opp. at 29.) However, even if these affidavits are credited, the Jacobsen Children are deemed to be on constructive or inquiry notice, because "if [they] had met [their] duty to act reasonably under the circumstances in investigating matters affecting [their] affairs, such an investigation, if conducted would have led to actual notice." *Diamond v. Davis,* 680 A.2d 364, 372 (D.C. 1996). Two matters of public record—(i) the Flatow Amendment, passed on September 30, 1996, and (ii) the March 11, 1998 decision in *Flatow*—which involved both minor and adult relatives of the victim of terrorism—provided inquiry, if not actual, notice to the plaintiffs. From either of these public events, the Jacobsen Children should have learned of the availability of solatium damages no later than March 1998, and thus, their complaint, which was filed on August 27, 2001, is time-barred.[12]

With respect to the first matter, on September 30, 1996, Congress passed the Civil Liability for Acts of State Sponsored Terrorism Act, Pub.L. No. 104–208, § 589, 110 Stat. 3009 (1996), *codified at* 28 U.S.C. § 1605 note, known commonly as the "Fla-

12. As noted herein, the children's complaint rests on the theory that their father acted as their agent, and since he had knowledge of these events, his knowledge would be imputed to his children so that they would have had actual, as well as constructive, notice.

tow Amendment." The Flatow Amendment added new language to the FSIA and consequently new causes of action for victims of terrorism. Importantly, the Amendment added language regarding the availability of solatium damages. Paragraph 40 of the Complaint directly relies on the Flatow Amendment: "[The FSIA] specifically permits the children of individuals held captive by terrorists, regardless of age, to pursue 'money damages which may include economic damages, solatium, pain and suffering. 28 U.S.C. § 1605(a)(7).'"

The publicly available Amendment was readily accessible to the Jacobsen Children upon reasonable investigation.[13] The Amendment became law only a few months after the filing of *Cicippio II,* and it is a matter of public record that the Court and counsel discussed the impact of the amendment on the *Cicippio II* plaintiffs with respect to the availability of suits against agents and instrumentalities under the FSIA. As a *Cicippio II* plaintiff, David Jacobsen knew about the new law, so his knowledge would be imputable to his children, since the theory underlying the Jacobsen Children's complaint is that their father acted as their agent so as to create an attorney-client relationship with defendants. It is undisputed that their father was actively involved in lobbying Congress in support of amending the FSIA. (*See* Def.'s Mem. at 6.)[14] Moreover, plaintiffs have acknowledged the significance of the Flatow Amendment in creating new remedies for plaintiffs in their position when alleging that "[Defendant Oliver] knew or should have known, as a result of his law firm's instrumental role ... in lobbying for the enactment of the 1996 amendments to the Foreign Service Immunities Act ... that the 1996 FSIA Amendments 'included solatium as [an] element compensatory damages where physical injury or death results from state sponsored terrorism.' *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 29 (D.D.C.1998) (Lamberth, J.)." (Pl.'s Opp. at 3.) It is beyond peradventure that the Jacobsen Children should have known as well. Thus, even if their father's actual knowledge does not constitute actual notice to the children, they were adults, who were clearly capable of discovering the viability of their own causes of action under the Flatow Amendment through reasonable investigation.

13. While the mere fact that the information was publicly available does not conclusively put the Jacobsen Children on inquiry notice, *see O'Connor v. Boeing North American, Inc.,* 92 F.Supp.2d 1026, 1043 (C.D.Cal.2000), *modified on reconsideration, O'Connor v. Boeing North American, Inc.,* 114 F.Supp.2d 949 (C.D.Cal.2000), the nature of the information and the particular characteristics of the Jacobsen Children as presented in their Complaint and affidavits—as persons closely linked to the *Cicippio* litigation who relied on their father to communicate as their agent with their attorneys—establish beyond doubt that they were on inquiry, if not actual, notice. *See, e.g., O'Connor,* 92 F.Supp.2d at 1043 (citing, *inter alia, Stutz Motor Car of America, Inc. v. Reebok Intern., Ltd.,* 909 F.Supp. 1353, 1362 (C.D.Cal.1995) (imputing knowledge of highly publicized advertising campaign of Reebok shoes where defendants were involved in the footwear industry); *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1170 (5th Cir.1979) (imputing knowledge circulated in beef industry publications to plaintiffs who were involved in the beef industry)); *see also Hughes,* 215 F.3d at 548 (plaintiff charged with constructive knowledge when there was widespread publicity in city where plaintiff resided).

14. In June 1994, Jacobsen testified before a Congressional subcommittee as part of the lobbying efforts to amend the FSIA to allow suit against terrorist states. *See Foreign Terrorism and U.S. Courts: Hearing on the Foreign Sovereign Immunity Act,* 103rd Cong. (1994) (statement of David P. Jacobsen), *available at* 1994 WL 14189167. In April 1996, Congress passed the AEDPA, and then in September 1996, it passed the Flatow Amendment further amending the FSIA.

Second, Judge Lamberth's *Flatow* decision on March 11, 1998, also established actual and/or inquiry notice. Ironically, plaintiffs cite in paragraphs 43–45 of their complaint to three other similar cases in which solatium damages were awarded to family members other than spouses, *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C.2001), *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27 (D.D.C. 2001), and *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107 (D.D.C.2000), but conveniently omit any reference to the *Flatow* decision even though they rely on *Flatow* to support their father's malpractice claim. (*See* Complaint ¶ 23.) In July 1998, defendant Oliver requested that the Court in *Cicippio II* take judicial notice of this decision (Oliver Declaration at ¶ 36), and the case is mentioned in the Memorandum of Law in Support of Plaintiffs' Request for Punitive Damages, filed July 21, 1998, in the *Cicippio II* action. (Pl.'s Opp. Ex. A at 2.) Moreover, as noted, the Jacobsen Children cite to *Flatow* in their pleadings as support for their underlying cause of action, noting that damages for solatium were included in the *Flatow* decision as compensatory damages. (Jacobsen Children's Mem. at 7; Pl.'s Opp. at 3).

The *Flatow* opinion discusses at great length the availability of solatium damages under the FSIA. *See Flatow*, 999 F.Supp. at 29–32. The lawsuit was brought under the FSIA against Iran, the MOIS, and agents of Iran by the two parents, two adult siblings, and two minor siblings of Alisa M. Flatow, the victim of a suicide bomber attack in Israel, and these relatives were awarded damages for solatium. *Id.* at 7, 32. The Court stated: "Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish." *Id.* at 32. As noted, this decision was a matter of public record, and the children's father, who acted as their agent, was well aware of it. Alternatively, the children were obligated to exercise reasonable diligence to learn of its contents.

Given the Flatow Amendment on September 30, 1996 and Judge Lamberth's decision on March 11, 1998, there can be no dispute that Jacobsen and his children were on either actual or inquiry notice. Therefore, the Jacobsen Children's claims in Counts IV and V are time-barred.[15]

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied as to Counts I and II and is granted as to Counts III, IV, and V. A separate Order accompanies this Opinion.

## ORDER

Upon consideration of the defendants' Motion to Dismiss, the plaintiffs' opposition, the defendants' reply, and the record herein, it is this 30th day of April, 2002, hereby

---

**15.** Because the Jacobsen Children's claims are barred by the statute of limitations, the Court need not address defendants' remaining arguments regarding the lack of an attorney-client relationship, any misrepresentation of a material fact, or any cognizable injury. As to the lack of any injury, it is, however, particularly noteworthy that both parties appear to agree that the children can still sue Iran or its instrumentalities for solatium damages, (*see* Def.'s Mem. at 24; Pl.'s Opp. at 37–38), and that plaintiffs request, as an alternative to dismissal, that the Court "stay or abate [their] . . . claims in the instant action, until the conclusion of their separate action against Iran and MOIS." (Pl.'s Opp. at 38.) If it is true that they can still sue, it is difficult to understand the logic of their position here. Moreover, a dismissal of their suit against defendants will have no impact on any suit they may bring against Iran or its instrumentalities.

ORDERED that defendant's Motion to Dismiss [2–1 and 4–1] is **GRANTED** in part and **DENIED** in part; and it is

**FURTHER ORDERED** that this matter is set down for an initial scheduling conference on May 31, 2002, at 10:15 a.m.

SO ORDERED.